# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# BEAUMONT DIVISION

| | |
|---|---|
| INDORAMA VENTURES HOLDINGS L.P.,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>FACTORY MUTUAL INSURANCE COMPANY,<br><br>　　　　　Defendant. | **JURY TRIAL DEMANDED**<br><br>Civil Action No. _____ |

## COMPLAINT

Plaintiff Indorama Ventures Holdings L.P. ("Indorama"), by and through its attorneys, hereby files this Complaint against Defendant Factory Mutual Insurance Company ("FM Global") alleging as follows:

## NATURE OF THE ACTION

1. In the early hours of November 27, 2019, liquid butadiene escaped from a fractionator at the TPC Group plant located in Port Neches, Jefferson County, Texas ("TPC Facility"). The butadiene vaporized and then ignited, which set off a chain reaction of at least three major explosions ("TPC Explosion"). Civilians felt the blasts 30 miles away. The explosions sent at least one process tower hurdling through the air, crumpled many others, and caused extensive damage to the TPC Facility. Two TPC employees, one TPC contractor, and at least five civilians sustained injuries. Fires burned within the TPC Facility for more than a month after the explosion. Officials in Jefferson County, Texas immediately declared a state of disaster and issued a mandatory evacuation order for everyone within a 4-mile radius and, in the coming weeks and months, would limit access to the TPC Facility and certain locations therein. In terms of property

damage alone, the TPC Explosion reportedly caused $450 million in on-site property damage and $153 million in off-site property damage to nearby homes and businesses.

2. Right across the street from the TPC Facility is the Indorama Plant (as defined herein), which Indorama contracted to purchase from Huntsman International LLC ("Huntsman") in August 2019 and ultimately did acquire as of January 3, 2020. The Indorama Plant is an "insured location" under the property damage and business interruption insurance Policy (as defined herein) at issue in this lawsuit.

3. Indorama is a world-class sustainable chemical company. The Indorama Plant in Port Neches, Texas includes an oxides and olefins ("O&O") plant, which manufactures olefins and ethylene oxide, as well as a plant that manufactures methyl tertiary butyl ether ("MTBE"), which is a high-octane clean-burning gasoline oxygenate used in more than 50 countries around the world to optimize combustion and reduce tailpipe emissions. MTBE can also be back-cracked to high-purity isobutylene for use as a chemical feedstock. Today, Indorama employs approximately 620 employees and uses the services of an additional approximate 208 independent contractors at the Indorama Plant, which currently manufactures approximately 1.6 billion pounds of MTBE and about 525 million pounds of propylene oxide ("PO") annually.

4. At the time of the TPC Explosion, the TPC Facility and the Indorama Plant shared a cooperative relationship. More specifically, Insured Property (as defined herein) – consisting of storage tanks, pipelines, and associated equipment owned or leased by Indorama and critical to the Indorama Plant's operations – was located *within the TPC Facility*; the TPC Facility is expressly identified as an "insured location" under the Policy.

5. That Insured Property at the TPC Facility (i) stored raw material and finished product in Indorama's storage tanks, (ii) transported that raw material through pipelines from the

storage tanks to the Indorama Plant for manufacture, and (iii) transported finished product through pipelines from the Indorama Plant for storage at the TPC Facility and/or for distribution at a nearby "PNO Dock," and at third party terminals connected via pipelines to the Indorama Plant via the TPC Facility.  Accordingly, Indorama's Insured Property at the TPC Facility was essential to the Indorama Plant's operations, production and distribution of products.

6. However, as a result of the TPC Explosion, the operations of the Insured Property at the TPC Facility and, in turn, the Indorama Plant were interrupted and forced to cease; some Insured Property also sustained property damage.

7. For instance, the TPC Facility (under a written contract) was the sole electricity supplier to the Insured Property at the TPC Facility.  However, the TPC Explosion damaged the power substation at the TPC Facility.  Thus, for several weeks following the TPC Explosion, the Insured Property lacked power and, consequently, could not function.

8. In addition, governmental orders prohibited access to areas within the TPC Facility, including the locations of Insured Property.  The governmental prohibition on accessing Insured Property lasted for at least sixty days after the explosion, preventing the restoration of the Insured Property's operations and causing business interruption loss.

9. The TPC Explosion further impacted Indorama's operations because governmental authorities prohibited access to the PNO Dock.  The PNO Dock, which is also an insured location under the Policy, is the terminal from which raw materials are received and finished products are transported via cargo ships.  However, the dock had to cease operations because it fell within the evacuation order's four-mile radius and because of the orders of the United States Coast Guard.

10. Ultimately, because of the referenced service interruptions and civil authority orders, Indorama sustained nearly $100 million in business interruption loss (as well as certain

repair and restoration costs for Insured Property).  Those losses are covered and reimbursable under several provisions of the Policy issued by and through FM Global.  While FM Global made a partial payment of loss, it has failed and refused to reimburse Indorama for the full remaining covered loss sustained as a result of the TPC Explosion.

11. Accordingly, Indorama brings this breach of contract and declaratory judgment action to obtain coverage for the full value of the significant business interruption loss that the TPC Explosion caused, which FM Global has improperly withheld and denied, plus interest and attorneys' fees.

## PARTIES, JURISDICTION, AND VENUE

12. Indorama is a limited partnership organized under the laws of Delaware with its principal place of business at 4235 South Stream Blvd., Suite 450, Charlotte, North Carolina 28217.

13. Indorama's limited partnership consists of: (i) Indorama Ventures Holdings Corporation ("IVHC"), a Delaware corporation with a principal place of business at 4235 South Stream Blvd., Suite 450, Charlotte, North Carolina 28217; and (ii) Indorama Ventures Logistics LLC, a Delaware limited liability company, whose sole member is a partnership, which (through another partnership) ultimately has IVHC as its sole partner.  Therefore, for purposes of diversity jurisdiction under 28 U.S.C. 1332 Indorama is a citizen of Delaware and North Carolina.

14. Upon information and belief, FM Global is an insurance company incorporated in Rhode Island with its principal place of business in Johnston, Rhode Island.

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy is greater than $75,000, exclusive of interest and costs.

16. Venue is proper in this district and division because it includes Jefferson County, Texas, which is the location (i) of risks and property insured under the Policy; (ii) of the Indorama Plant, the Insured Property, and the PNO Dock; and (iii) of the TPC Explosion, which gives rise to the losses at issue in this action.

17. This Court has personal jurisdiction over FM Global because FM Global expressly agreed to, and did, insure risks and locations located in Texas, including the Indorama Plant, the TPC Facility (and Insured Property located therein), and the PNO Dock. In addition, the Policy also states that "[i]t is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder or in the event of any other dispute relating to this Policy, the Company, at the request of the Insured … will submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all of the requirements necessary to give such court jurisdiction…."

**FACTUAL ALLEGATIONS**

A. **INDORAMA ACQUIRES THE INDORAMA PLANT AND RIGHTS UNDER THE POLICY TO RECOVER LOSSES IN CONNECTION WITH THE TPC EXPLOSION.**

18. Through that certain Equity and Asset Purchase Agreement by and between Huntsman, as Seller; Indorama, as Buyer; and Indorama Ventures Public Company Ltd., as Buyer Guarantor dated August 7, 2019 ("Purchase Agreement"), Indorama acquired from Huntsman, among other businesses and assets, Huntsman's PO/MTBE plant located at 2701 TX-136 Spur, Port Neches, Texas 77651 and Huntsman's O&O Plant located at 6001 Highway 366, Port Neches, Texas 77651 (together, "Indorama Plant") as well as the Insured Property located at the TPC Facility ("Transaction").

19. After the signing of the Purchase Agreement but prior to the closing of the Transaction on January 3, 2020, the TPC Explosion occurred on November 27, 2019.

20. FM Global issued and/or reinsures property and business interruption policy no. PROP 19-20 with a period of November 1, 2019 to November 1, 2020 ("Policy"), which was issued to Huntsman Corporation (and various affiliates) as insureds. FM Global is responsible for adjusting insurance claims and ultimately paying loss under the Policy.

21. As set forth below, the Indorama Plant, Insured Property, and PNO Dock are "insured locations" under the Policy.

22. Following the TPC Explosion, Huntsman submitted an insurance claim to FM Global under the Policy.

23. To facilitate the closing of the Transaction, Huntsman (along with certain affiliates) and Indorama entered into a certain Insurance Assignment Agreement dated January 3, 2020 ("Insurance Assignment Agreement"). Under the Insurance Assignment Agreement, Huntsman agreed to and did assign and delegate to Indorama all of Huntsman's rights, duties, and obligations with respect to any claims for property damage and/or business interruption coverage in connection with the TPC Explosion under the Policy.

24. FM Global expressly consented to the assignment to Indorama as set forth in the Insurance Assignment Agreement and agreed and acknowledged that all loss payable under the Policy will be paid directly to Indorama in accordance with the Insurance Assignment Agreement. Indeed, FM Global's partial payment of loss (discussed below) was first tendered to Indorama before being redirected to Huntsman (as required under an Insurance Assignment Agreement and Insurance Settlement Agreement).

25. Accordingly, Indorama has the acknowledged right, and is the proper party, to pursue, receive, and recover loss under the Policy in connection with the property damage and business interruption arising out of the TPC Explosion ("Insurance Claim").

**B.     THE POLICY.**

26.    The Policy states that it "covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy," including both physical loss and business interruption loss, among other costs and expenses, as detailed below.

27.    The Policy provides "TIME ELEMENT COVERAGE EXTENSIONS," which include, *inter alia*, coverage for "CIVIL OR MILITARY AUTHORITY" and "SERVICE INTERRUPTION TIME ELEMENT."

28.    The Policy's "SERVICE INTERRUPTION TIME ELEMENT" coverage ("Service Interruption Coverage") insures:

> the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of service interruption at an insured location when the loss is caused by the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of accidental event or physical loss or damage of the type insured under this Policy at the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable services.

29.    The Policy also provides that "[t]his Extension will apply when the period of service interruption is in excess of 48 hours."  The Service Interruption Coverage is subject to a $75,000,000 sublimit.

30.    The Policy's "CIVIL OR MILITARY AUTHORITY" coverage ("Civil Authority Coverage") states:

> This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured location provided such order is the direct result of physical damage of the type insured at the insured location or within five statute miles/eight kilometers of it.

31. Under the Civil Authority Coverage, "The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

> The period of time:
>
> 1) Starting at the time of such physical damage; and
>
> 2) Ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,
>
> this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section."

32. The Civil Authority Coverage has no sublimit; rather, it covers all loss up to 60 days as set forth in "the LIMITS OF LIABILITY clause in the DECLARATIONS section."

33. Loss insured under the "TIME ELEMENT" coverages in the Policy described above include either "GROSS EARNINGS" or "GROSS PROFIT."

34. "GROSS EARNINGS" are the "Actual Loss Sustained by the Insured . . . during the PERIOD OF LIABILITY" of "Gross Earnings" less "all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services" plus "costs associated with take or pay contracts covering the purchase of raw materials" plus "all other earnings derived from the operation of the business."

35. "GROSS PROFIT" is the "Actual Loss Sustained by the Insured . . . due to the necessary interruption of business during the PERIOD OF LIABILITY" of the "Reduction in Sales" and "Increase in Cost of Doing Business."

36. Under the Policy, the term "EXTRA EXPENSE" means:

> the reasonable and necessary extra costs incurred by the Insured of the following during the PERIOD OF LIABILITY: 1) extra expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business; 2) extra costs of temporarily using property or facilities of the Insured or others; and 3) costs to purchase finished goods from third parties to fulfill orders when

such orders cannot be met due to physical loss or damage to the Insured's finished goods, less payment received for the sale of such finished goods less any value remaining at the end of the PERIOD OF LIABILITY for property obtained in connection with the above.

37. Under the Policy, the term "PERIOD OF LIABILITY" applicable to coverages for "buildings and equipment" is the period "starting from the time of physical loss or damage of the type insured; and . . . ending when with due diligence and dispatch the building and equipment could be [] repaired or replaced; and [] made ready for operations, under the same or equivalent physical and operating conditions that existed prior to the damage" and is not "limited by the expiration of" the Policy.

38. Under the Policy, the term "location" means:

> as specified in the Schedule of Locations, or if not so specified in the Schedule of Locations: a building yard, dock, wharf, pier or bulkhead (or any group of the foregoing), bounded on all sides by public streets, clear land space or open waterways, each not less than 50 feet/15 metres (sic) wide. Any bridge or tunnel crossing such street, space or waterway will render such separation inoperative for the purpose of this definition.

39. The Indorama Plant, the TPC Facility (containing the Insured Property), and the PNO Dock are each "specified in the Schedule of Locations" and, therefore, are "insured locations" under the Policy. Specifically, on the "Schedule of Locations" the Indorama Plant is Location No. 2; the TPC Facility is Location No. 147; and the PNO Dock is Location No. 17.

C. **THE INSURED PROPERTY AT THE TPC FACILITY.**

40. At all relevant times, the Indorama Plant and the TPC Facility shared a cooperative relationship.

41. For example, as of the date of the TPC Explosion, Huntsman, and after the Transaction's closing, Indorama, owned and/or leased twelve MTBE storage tanks, two methanol

storage tanks, and related pipelines and equipment, all of which was located at the TPC Facility ("Insured Property").

42. Those MTBE and methanol storage tanks supported manufacturing operations at the Indorama Plant by temporarily storing partly finished products (work in progress) or off-specification products for reprocessing.

43. Those tanks were connected directly to the Indorama Plant as well as the PNO Dock Plant Site through the referenced pipelines and equipment so that (i) the tanks could receive and store raw materials from the dock to later transfer to the Indorama Plant and (ii) the tanks could store finished product from the Indorama Plant and then deliver it to the docks and marine terminals for distribution.

44. At the time of the TPC Explosion, the Insured Property located at the TPC Facility received their electricity exclusively from the TPC Facility on a 24-hour per day, 7-day per week basis.

45. Specifically, Indorama contracted for the TPC Facility to supply electricity to the Insured Property through a (i) June 27, 2006 Operating Agreement with a TPC affiliate, which Indorama assumed as a result of the Transaction ("Operating Agreement") and (ii) June 27, 2006 Shared Use and Services Agreement with a TPC affiliate, which Indorama also assumed ("Shared Use Agreement").

46. Under both agreements, "Service Provider [*i.e.*, TPC] shall provide the Operating Services on a 24-hour per day and 7-day per week basis, in a good and workmanlike manner…." Such services expressly include providing "electricity and other necessary operating utilities as needed for operation of . . . the Exclusive Use Assets [*i.e.*, the MTBE tanks]" (under the Operating

Agreement) and "the Shared Use Assets [*i.e.*, the methanol tanks]" (under the Shared Use Agreement).

### D.   THE TPC EXPLOSION AND RESULTING BUSINESS INTERRUPTION LOSS.

47.   The TPC Explosion, which occurred on November 27, 2019, originated in the South Unit of the TPC Facility when liquids primarily consisting of butadiene escaped from a fractionator.  The liquid butadiene vaporized and then ignited, resulting in an explosion that created a pressure wave that caused extensive damage throughout the TPC Facility and caused damage to buildings, including houses, offsite.  The damage from the first explosion triggered at least two more explosions at the TPC Facility.

*<center>Service Interruption</center>*

48.   The TPC Explosion damaged a power substation located at the TPC Facility that supplied power to the Insured Property.  The power substation, known as Substation WA, which was near the explosion site and sustained extensive damage, served as the only source of power for the TPC Facility and, in turn, the Insured Property.

49.   Substation WA supplied electricity to the Insured Property as follows: (i) to the MTBE tanks (and pipelines and other miscellaneous associated equipment) through Substation F-5 and (ii) to the methanol tanks (and pipelines and other miscellaneous associated equipment) through Substation 2-B, located within the TPC Facility.

50.   The lack of electricity to the Insured Facilities prevented the flow of MTBE and methanol among the offsite dock, the tanks, and the Indorama Plant.  As a result, the Insured Property could not operate and, in turn, the Indorama Plant could not operate because it could neither receive raw materials nor distribute finished products.  As a result, Indorama sustained substantial business interruption loss.

### *Civil or Military Authority*

51. In addition, orders from the relevant local, state, and federal authorities following the TPC Explosion prohibited access to the Insured Property for months and, in turn, prevented the Insured Property and Indorama Plant from operating.

52. The TPC Explosion triggered the Federal Emergency Management Agency's ("FEMA") National Incident Management System ("NIMS"). Under NIMS, Jefferson County Judge Jeff R. Branick was appointed as the Incident Commander ("Incident Commander").

53. On November 27, 2019, the Incident Commander issued a mandatory evacuation order for individuals within four miles of the TPC Facility (with only certain limited exceptions for essential personnel). This order initially restricted access to the Insured Property at the TPC Facility, to the Indorama Plant, and to the PNO Docks.

54. As a result of subsequent civil authority orders from the Incident Commander, the Chemical Safety and Hazard Investigation Board ("CSB"), the Occupational Safety & Health Administration ("OSHA"), and court orders and injunctions, Indorama was partially or totally prohibited from accessing the TPC Facility and/or Insured Property for at least 60 days after the explosion.

55. Specifically, as a result of these civil authority orders, Indorama was not permitted to enter the TPC Facility until December 13, 2020. And, at that time, Indorama was only permitted onto the TPC Facility to conduct a visual inspection.

56. In the weeks following the TPC Explosion, the Incident Commander and CSB established "exclusion zones" within the TPC Facility where access was prohibited.

57. Because of the exclusion zones established by civil authorities, the transportation of hydrocarbons through the TPC Facility was restricted because of the concern of subsequent

explosions until the fire, still burning at the TPC Facility, was finally extinguished on January 4, 2020.

58. The Incident Commander did not permit access to the TPC Facility to begin any repairs until January 13, 2020, when the exclusion zone was reduced. However, Indorama still did not have full access to the Insured Property: the MTBE recycle pipeline remained within the CSB's and Incident Commander's exclusion zone with access restricted until January 29, 2020. That pipeline was critical for Indorama's transfer of product between the MTBE tanks and the Indorama Plant.

59. The TPC Facility, including the Insured Property, was also subject to judicial temporary restraining orders and injunctions following the TPC Explosion which prohibited Indorama's ability to access or use the Insured Property, which also caused business interruption loss.

60. In addition, the Incident Commander's mandatory evacuation order and orders of the U.S. Coast Guard prohibited access to the PNO Dock, which is an insured location under the Policy, for multiple days until at least November 29, 2020. The lack of access to the PNO Dock compounded the business interruption loss caused by the TPC Explosion.

E.  **FM GLOBAL'S IMPROPER DENIAL OF CIVIL AUTHORITY AND SERVICE INTERRUPTION COVERAGES.**

61. To date, Indorama has submitted a total business interruption (and property damage) loss to FM Global for approximately $100 million.

62. Because the TPC Explosion is plainly a covered event and gave rise to covered business interruption loss, FM Global had no choice but to acknowledge that the Insurance Claim is covered under the Policy. However, to try to minimize its coverage obligation and wrongfully avoid paying the full amount of covered loss, FM Global only agreed to cover the Insurance Claim

under the Policy's "Contingent Time Element Extension" coverage ("CTEE Coverage"), which (not coincidentally) has the *lowest* potentially applicable sublimit of $50 million.  Further, by invoking only the CTEE Coverage, FM Global wrongly asserts that loss under the Service Interruption and Civil Authority Coverages is *subsumed* within the CTEE Coverage – even though the Civil Authority and Service Interruption Coverages are *separate* coverages that are *independently* triggered by the TPC Explosion and its direct impact on Insured Property.

63. FM Global ultimately paid the $50 million CTEE sublimit ("CTEE Payment"); under the Insurance Settlement Agreement between Indorama and Huntsman, entered into to facilitate the closing of the Transaction, the CTEE Payment ultimately went to Huntsman.

64. However, Indorama has a remaining loss of approximately $50 million – that exceeds the CTEE Payment – which is covered under the Policy ("Remaining Loss").  Indorama has requested that FM Global pay the Remaining Loss under the Policy's separate and independent Civil Authority Coverage and/or Service Interruption Coverage, but FM Global has wrongly failed and refused to pay the Remaining Loss.  Upon information and belief, by invoking only the CTEE Coverage, FM Global improperly attempts to avoid paying the Remaining Loss that is also covered under the Policy.

65. The Remaining Loss is covered under the Policy's Service Interruption Coverage because: (1) the losses are "Actual Loss Sustained" and "EXTRA EXPENSE incurred" during the period of the service interruption at the Insured Property, which is located at an insured location under the Policy; (2) the losses were caused by the interruption of electricity to the Insured Property, which is a covered service interruption under the Service Interruption Coverage; (3) the electricity interruption happened by reason of the TPC Explosion, which was an "accidental event" or other "physical loss or damage of the type insured" under the Service Interruption Coverage;

(4) the TPC Facility, where the TPC Explosion occurred, was the supplier of electricity services to the Insured Property and is located within the Policy's "Territory"; and (5) the TPC Explosion immediately prevented the flow of electricity to the Insured Property.

66.     The loss is also covered under the Policy's Civil Authority Coverage because: (1) the losses are "Actual Loss Sustained" and "EXTRA EXPENSE incurred" during the duration of the 60-day period following the TPC Explosion; (2) the referenced civil and military authority orders are "order[s] of civil or military" authorities under the Civil Authority Coverage; (3) the referenced orders limited, restricted, and prohibited partial and total access to the Insured Property, which are at insured locations under the Policy; (4) the orders are the direct result of the TPC Explosion, which is "physical damage of the type insured" under the Policy; and (5) the TPC Explosion occurred at an insured location, which housed the Insured Property.

67.     Based on the foregoing, FM Global has a contractual obligation and duty under the Policy to cover and reimburse Indorama for the full value of the Remaining Loss, but FM Global has failed and refused to do so under the Civil Authority and/or Service Interruption Coverages or otherwise.

68.     Indorama has complied with all applicable terms and conditions of the Policy.

### FIRST CAUSE OF ACTION
**Declaratory Judgment**

69.     Indorama repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if they were set forth herein.

70.     Under the terms of the Policy, FM Global agreed to insure against "ALL RISK OF PHYSICAL LOSS OR DAMAGE" and, therefore, has a contractual duty to pay loss, including business interruption loss, under the Policy, including but not limited to under the Policy's Civil Authority Coverage and/or Service Interruption Coverage.

71. As a result of the TPC Explosion, which is a covered risk under the Policy, Indorama has sustained loss covered under the Policy, including but not limited to under the Policy's Civil Authority and/or Service Interruption Coverages.

72. With respect to the TPC Explosion and the Insurance Claim, Indorama is the assignee of the Insurance Claim and rights to coverage under the Policy. FM Global consented to such assignment and agreed that any loss payable under the Policy will be paid directly to Indorama.

73. FM Global, despite repeated demands by Indorama, has failed and refused to cover the Remaining Loss, which is due and owing under the Policy.

74. By reason of the foregoing, an actual and justiciable controversy exists between the Indorama and FM Global regarding FM Global's obligation to reimburse Indorama for its Remaining Loss under the Policy.

## SECOND CAUSE OF ACTION
**Breach of Contract**

75. Indorama repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if they were set forth herein.

76. Indorama and/or Huntsman have fully performed all of their obligations under the Policy.

77. Under the terms of the Policy, FM Global agreed to insure against "ALL RISK OF PHYSICAL LOSS OR DAMAGE" and, therefore, has a contractual duty to pay loss, including business interruption loss, under the Policy, including but not limited to the Policy's Civil Authority Coverage and/or Service Interruption Coverage.

78. As a result of the TPC Explosion, which is a covered risk under the Policy, Indorama has sustained loss covered under the Policy, including but not limited to under the Policy's Civil Authority and/or Service Interruption Coverages.

79. With respect to the TPC Explosion and the Insurance Claim, Indorama is the assignee of the Insurance Claim and rights to coverage under the Policy. FM Global consented to such assignment and agreed that any loss payable under the Policy will be paid directly to Indorama.

80. FM Global, despite repeated demands by Indorama, has failed and refused to pay the Remaining Loss, which is due and owing under the Policy. As a result, FM Global has breached the Policy.

81. As a direct and proximate cause of FM Global's breach of the Policy, Indorama has sustained, and will continue to sustain, substantial damages.

### THIRD CAUSE OF ACTION
**Texas Insurance Code**
**(Statutory Interest and Attorneys' Fees)**

82. Indorama repeats, realleges, and incorporates by reference each and every allegation contained in the preceding paragraphs as if they were set forth herein.

83. FM Global has improperly denied its coverage obligations and, in doing so, has breached the Policy and caused Indorama to sustain damages.

84. FM Global has forced Indorama to file this coverage action to receive the benefits of the coverage to which Indorama is entitled under the Policy.

85. As a result of FM Global's wrongful withholding of coverage under the Policy, Indorama incurred, and will continue to incur, attorneys' fees and expenses to obtain the benefits of the Policy through this coverage action.

86. Upon prevailing in this coverage action, FM Global is required to reimburse Indorama for its attorneys' fees and all other expenses incurred to obtain the benefits of the Policy plus statutory interest pursuant to Tex. Ins. Code Ann. § 542.060, among other potentially applicable sections of the Texas Insurance Code.

## REQUEST FOR RELIEF

**WHEREFORE**, Indorama requests that this Court grant a judgment in its favor against FM Global as follows:

(a) As to the First Cause of Action, a declaration that the Policy requires FM Global to cover the Insurance Claim under the Service Interruption and/or Civil Authority Coverages and to reimburse Indorama for its Remaining Loss in an amount to be proven at trial;

(b) As to the Second Cause of Action, award Indorama compensatory damages in an amount to be proven at trial;

(c) As to the Third Cause of Action, an award to Indorama of all its attorneys' fees, costs, expenses, and interest to which Indorama is entitled under the applicable provisions of the Texas Insurance Code; and

(d) As to all Causes of Action, (i) order FM Global to pay pre- and post-judgment interest and attorney's fees and expenses; and (ii) award such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Indorama hereby demands trial by a jury as to all triable issues.

Dated: October 7, 2024

        Respectfully Submitted,

        **ORGAIN BELL & TUCKER LLP**

        */s/ Jack P. Carroll*

        jpc@obt.com
        State Bar No. 03886000
        470 Orleans Street, Fourth Floor
        Beaumont, Texas 77701
        (409) 838-6412

        and

        Michael David Lichtenstein (*pro hac vice* forthcoming)
        Eric Jesse (*pro hac vice* forthcoming)
        **LOWENSTEIN SANDLER LLP**
        1251 Avenue of the Americas
        New York, New York 10020
        (212) 262-6700
        mlichtenstein@lowenstein.com
        ejesse@lowenstein.com

        *Attorneys for Indorama Ventures Holdings L.P.*