IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| INDORAMA VENTURES HOLDINGS L.P.,<br><br>*Plaintiff,*<br><br>VS.<br><br>FACTORY MUTUAL INSURANCE COMPANY,<br><br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 1:24-CV-00404<br>JUDGE MICHAEL J. TRUNCALE |

**ORDER DENYING DEFENDANT FACTORY MUTUAL INSURANCE COMPANY'S RULE 12(B)(6) MOTION TO DISMISS**

Before the Court is Defendant Factory Mutual Insurance Company ("Factory Mutual")'s Rule 12(B)(6) Motion to Dismiss. [Dkt. 7]. Factory Mutual filed its motion in this Court on December 16, 2024. *Id.* After the Court provided an extension [Dkt. 10], Plaintiff Indorama Ventures Holdings, L.P. ("Indorama") filed its Response on January 13, 2025. [Dkt. 11]. After the Court granted an extension, Factory Mutual filed its Reply on January 28, 2025. [Dkts. 13, 19]. Indorama did not file a Sur-Reply and the window for doing so has now closed. *See* E.D. Tex. Loc. Civ. R. 7(f). The pending motion is now ripe for review.

For the reasons stated below, the Court **DENIES** Factory Mutual's motion.

## I. BACKGROUND

This is an insurance dispute that stems from an explosion at the TPC Group plant located in Port Neches ("TPC Facility"). [Dkt. 1 at ¶ 1]. Indorama brings a breach of contract and declaratory judgment action to obtain coverage for the full value of business interruption losses caused by the explosion. *Id.* at ¶ 11.

The Court has this case on diversity. *Id.* at ¶ 15. Indorama is a limited partnership organized under the laws of Delaware and with its principal place of business in North Carolina. *Id.* at ¶ 12. Factory Mutual is an insurance company incorporated in Rhode Island and with its principal place of business in Jonston, Rhode Island. *Id.* at ¶ 14.

**a. The TPC Explosion**

In the early hours of November 27, 2019, liquid butadiene escaped from a fractionator in the South Unit at the TPC Facility. *Id.* at ¶¶ 1, 47. The butadiene vaporized and then ignited, which set off a chain reaction of at least three major explosions ("TPC Explosion"). *Id.*

Civilians felt the blasts up to 30 miles away. *Id.* at ¶ 1. The explosions sent at least one process tower hurdling through the air, crumpled many others, and caused extensive damage to the TPC Facility. *Id.* Two TPC employees, one TPC contractor, and at least five civilians sustained injuries. *Id.*

Fires burned within the TPC Facility for more than a month after the explosion. *Id.* Jefferson County officials immediately declared a state of disaster and issued a mandatory evacuation order for everyone within a 4-mile radius; in the coming weeks and months, it would limit access to the TPC Facility and certain locations therein. *Id.* In terms of property damage alone, the TPC Explosion reportedly caused $450 million in on-site damage and $153 million in off-site damage to nearby homes and businesses. *Id.*

**b. Indorama, Huntsman, and Factory Mutual**

Indorama is a world-class sustainable energy company. *Id.* at ¶ 3. Indorama owns two plants across the street from the TPC Facility: (1) an oxides and olefins plant ("O&O Plant"),[1] which manufactures olefins and ethylene oxide, and (2) a plant that manufactures methyl tertiary butyl ether ("MTBE Plant"),[2] a high-octane, clean-burning gasoline oxygenate used in more than 50 countries around the world to optimize combustion and reduce tailpipe emissions (collectively, "Indorama Plant"). *Id.*

On August 7, 2019, Indorama executed an Equity and Asset Purchase Agreement ("Purchase Agreement") with Huntsman International, LLC ("Huntsman") for the Indorama Plant and property located at the TPC Facility (which included twelve MTBE storage tanks, two methanol storage tanks,

---

[1] The O&O Plant is located at 6001 Highway 366, Port Neches, TX, 77651. [Dkt. 1 at ¶ 18].

[2] The MTBE Plant is located at 2701 TX-136 Spur, Port Neches, TX, 77651. [Dkt. 1 at ¶ 18].

and related pipelines and equipment[3]) ("TPC Facility Property"). *Id.* at ¶¶ 18, 41. Indorama ultimately acquired the Indorama Plant and the TPC Facility Property on January 3, 2020. *Id.* at ¶ 19. The TPC Explosion occurred between the execution of the Purchase Agreement and this closing date. *Id.*

According to the Complaint, Factory Mutual "issued and/or reinsures" property and business interruption policy no. PROP 19-20 with a period of November 1, 2019 to November 1, 2020 (the "Policy"). *Id.* at ¶ 20. The Policy was issued to Huntsman, and various affiliates, as insureds. *Id.* According to the Complaint, "[Factory Mutual] is responsible for adjusting insurance claims and ultimately paying loss under the Policy." *Id.*

Although the Policy was issued to Huntsman, Indorama eventually became folded into it. To facilitate the closing on January 3, 2020, Huntsman and Indorama entered into an assignment agreement on that same day ("Insurance Assignment Agreement"). *Id.* at ¶ 23. Under this agreement, Huntsman assigned all of its rights, duties, and obligations with respect to any claims under the Policy for property damage and/or business interruption based on the TPC Explosion. *Id.* Factory Mutual expressly consented to this agreement. *Id.* at ¶ 24. Additionally, Factory Mutual agreed that all loss payable under the Policy would be paid directly to Indorama (to be redirected to Huntsman). *Id.*

### c. Indorama's Claim

The TPC Explosion disrupted Indorama's operations in two ways. *Id.* at ¶ 6. First, it damaged the power substation at the TPC Facility (Substation WA) that was the sole source of electricity for the TPC Facility Property.[4] *Id.* at ¶¶ 7, 44, 48–49. As such, the TPC Facility Property lacked power and could not operate for several weeks following the TPC explosion. *Id.* at ¶¶ 7, 50.

---

[3] This property facilitated the cooperative relationship between the Indorama Plant and the TPC Facility. [Dkt. 1 at ¶ 40]. The property helped to (i) store raw material and finished product, (ii) transport raw material to the Indorama Plant for manufacturing, and (iii) transport finished product from the Indorama Plant to the TPC Facility for storage and/or for distribution at a nearby "PNO Dock" (and at third party terminals connected to the Indorama Plant from the TPC Facility). *Id.* at ¶ 5.

[4] Indorama contracted with the TPC Facility for electricity supply through two agreements (which Indorama assumed via the Purchase Agreement). [Dkt. 1 at ¶¶ 45–46].

Second, orders from local, state, and federal authorities barred access to the TPC Facility Property for months. *Id.* at ¶ 51. The TPC Explosion triggered the Federal Emergency Management Agency's National Incident Management System ("NIMS"). *Id.* at ¶ 52. Under NIMS, Jefferson County Judge Jeff R. Branick was appointed as incident commander. *Id.* On November 27, 2019, Judge Branick issued a mandatory evacuation order for individuals within four miles of the TPC Facility (with limited exceptions for essential personnel). *Id.* at ¶ 53. This order encompassed the Indorama Plant, the TPC Facility Property, and the PNO Docks. *Id.*

As a result of subsequent civil authority orders from Judge Branick, the Chemical Safety and Hazard Investigation Board, the Occupational Safety & Health Administration, and court orders and injunctions, Indorama was partially or totally prohibited from accessing the TPC Facility for at least 60 days after the TPC explosion. *Id.* at ¶¶ 8, 54.

The fire from the TPC Explosion was extinguished on January 4, 2020.[5] *Id.* at ¶ 57. Indorama did not have full access to the TPC Facility Property until January 29, 2020. *Id.* at ¶ 58. And Judge Branick's and the U.S. Coast Guard's orders prohibited access to the PNO Dock—the vital terminal for receiving raw materials and transporting finished product—until November 29, 2020. *Id.* at ¶¶ 9, 60.

Indorama alleges that it suffered nearly $100 million in business interruption loss from these circumstances, as well as certain repair and restoration costs. *Id.* at ¶ 10.

The Indorama Plant, the TPC Facility Property, and the PNO Dock are listed as "insured locations" under the Policy. *Id.* at ¶ 21. Accordingly, Indorama submitted a claim to Factory Mutual after the TPC Explosion. *Id.* at ¶ 22.

While Factory Mutual has made a payment for the loss (of $50 million), Indorama alleges that Factory Mutual has wrongfully denied coverage for the remaining loss ($50 million). *Id.* at ¶¶ 10, 63–64. More specifically, Indorama alleges that Factory Mutual strategically covered the loss under the

[5] Indorama was permitted to enter the TPC Facility for a visual inspection on December 13, 2020. [Dkt. 1 at ¶ 55].

Policy's "Contingent Time Element Extension" coverage ("CTEE Coverage")—which had the lowest applicable sublimit of $50 million—and claimed that the coverages for civil authority and business interruption were subsumed within it.[6] *Id.* at ¶¶ 62, 65–66.

On these facts, Indorama brings a claims for a declaratory judgment, breach of contract, and violations of the Texas Insurance Code. [Dkt. 1 at ¶¶ 69–86].

In the pending motion, Factory Mutual seeks a dismissal since Indorama does not have the right to bring a direct claim against it (a reinsurer). [Dkt. 7 at 2]. Alternatively, Factory Mutual argues that (i) Indorama is essentially seeking benefits under a reinsurance agreement, and (ii) it is subject to the exclusive forum-selection clause within that agreement, which requires any disputes to be brought in Rhode Island state court. *Id.*

## II. LEGAL STANDARDS

### a. Motion to Dismiss under Rule 12(b)(6)

A court may dismiss a complaint for its "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In considering a 12(b)(6) motion, the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007) (per curiam) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). In doing so, the Court cannot "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (citations omitted). To survive a 12(b)(6) challenge, a complaint must allege "enough [well-pleaded] facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (Souter, J., dissenting) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* FED. R. CIV. P. 8(a)(2) ("A pleading that states a claim for relief must contain[] . . . a short and plain statement of the claim showing that the pleader is entitled to relief.").

[6] The Court will not run through the gauntlet of the Policy's language since it is outside the scope of this Order.

A claim is "plausible on its face" if its well-pleaded facts lead to "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). By contrast, "if a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility." *Id.* (cleaned up). Determining whether a plausible claim exists is "a context-specific task that requires the . . . [C]ourt to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

## III. DISCUSSION

### a. Attachments

At the outset, the Court must decide what attachments it will consider at this juncture. The pending motion has two attachments: (1) the Policy [Dkt. 7-1], (2) the reinsurance agreement between Factory Mutual and International Risk Insurance Company ("IRIC") ("Reinsurance Agreement") [Dkt. 7-2], and (3) the Insurance Assignment Agreement [Dkt. 7-3]. Indorama's Response has two attachments of its own: two emails sent from Factory Mutual's Senior Adjuster ("Adjustment Emails") [Dkt. 11-1], and a subrogation agreement between Indorama and Factory Mutual ("Subrogation Agreement"). [Dkt. 11-2]. The Court will consider the Policy, the Insurance Assignment Agreement, and the Adjustment Emails. However, the Court will not consider the Subrogation Agreement and does not have to consider the Reinsurance Agreement.

"If, on a motion under Rule 12(b)(6) . . . *matters outside the pleadings are presented to and not excluded* by the court, the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d) (emphasis added). "All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.*

As with most general rules, this one has a couple of exceptions. First, courts may consider matters of which they can take judicial notice. *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017–18 (5th Cir. 1996); *see also* FED. R. EVID. 201(b), (d). Second, courts may consider documents

attached to a Rule 12(b)(6) motion[7] "that [1] are referred to in the plaintiff's complaint and [2] are central to the plaintiff's claim."[8] *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). The second exception is the relevant one for this matter.

The Court will start with the easy scenarios. Clearly the Court can consider the Policy. The Complaint quotes directly from it at length. *See* [Dkt. 1 at ¶¶ 26–39]; *see Scanlan*, 343 F.3d at 536. Further, it is the lifeblood of Indorama's claims since it argues that (i) the remaining loss is clearly covered under the Policy's service interruption and civil authority coverages, and (ii) Factory Mutual wrongfully denied coverage under these provisions by manipulating the CTEE Coverage. *Id.* at ¶ 62; *see also Vaughn*, 2010 WL 3488244, at *22 n.18.

The Court can consider the Insurance Assignment Agreement for largely the same reasons; the Complaint references it directly, this agreement is the reason why Indorama received Factory Mutual's $50 million payment, and it explains why Indorama is presently suing under the Policy in the first place. [Dkt. 1 at ¶¶ 23– 24]; *see also Scanlan*, 343 F.3d at 536; *see also Vaughn*, 2010 WL 3488244, at *22 n.18.

The Court will not consider the Subrogation Agreement. This agreement is never referenced in the Complaint, and it is arguably peripheral to Indorama's claims.

---

[7] This rule equally applies to documents attached to Indorama's Response. *See Boudreaux v. Shell Oil Co.*, No. CIV.A. 13-4762, 2014 WL 348545, at *2 (E.D. La. Jan. 31, 2014) (citing *Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 785 (5th Cir. 2007)).

[8] The "Fifth Circuit has not articulated a test for determining when a document is central to a plaintiff's claims," but "the case law suggests that documents are central when they are *necessary* to establish an element of one of the plaintiff's claims." *Crucci v. Seterus, Inc.*, No. EP-13-CV-317, 2013 WL 6146040, at *4 (W.D. Tex. Nov. 21, 2013) (emphasis added) (citation omitted); *see also Kaye v. Lone Star Fund v. (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011); *see also Vaughn Med. Equip. Repair Serv., L.L.C. v. Jordan Reses Supply Co.*, No. CIV.A. 10-00124, 2010 WL 3488244, at *22 n.18 (E.D. La. Aug. 26, 2010) (citing *Walker v. S.W.I.F.T. SCRL*, 517 F.Supp.2d 801, 806 (E.D. Va. 2007) (noting that not every document referenced in the complaint can be considered because the referenced document must be "central or integral to the claim in the sense that its very existence, and not the mere information it contains, gives rise to the legal rights asserted.")).

When consulting documents that satisfy this standard, "a court is still bound to draw all inferences in favor of the plaintiff." *Wood v. Bexar Cnty., Texas*, No. 22-50888, 2023 WL 3563012, at *1 (5th Cir. May 19, 2023) (per curiam) (citing *T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407, 413 (5th Cir. 2021)).

That leaves us with the closer calls: the Adjustment Emails and the Reinsurance Agreement. The Court will consider the Adjustment Emails. Even though these are never mentioned in the Complaint, Indorama *does* allege that "[Factory Mutual] is responsible for adjusting insurance claims and ultimately paying loss under the Policy." [Dkt. 1 at ¶ 20]. The Adjustment Emails are tethered to these allegations of responsibility and that responsibility is central to Indorama's ability to bring the present suit.

However, the Reinsurance Agreement is a different case. The term "reinsurance" appears nowhere in the Complaint. *See generally* [Dkt. 1]. And the term "reinsure" only appears once: "[Factory Mutual] issued and/*or reinsures* property and business interruption policy no. PROP 19-20 with a period of November 1, 2019 to November 1, 2020[.]" *Id.* at ¶ 20 (emphasis added). Even if this constitutes a reference to the Reinsurance Agreement, the agreement is clearly not central to Indorama's claim.

All the quoted policy language in the Complaint derives from *the Policy*. *See id.* at ¶¶ 26–39. Language from the Reinsurance Agreement is nowhere in sight. Though the Reinsurance Agreement is clearly significant to *Factory Mutual's* ground for dismissal, the same cannot be said for *Indorama's claims*—to the Court, this is a distinction that makes a difference. *See Williams v. JP Morgan Chase Bank*, No. 3:12-CV-2860-N, 2013 WL 12363097, at *4 (N.D. Tex. Mar. 12, 2013) (Godbey, J.) (emphasis added) ("Although Chase's documents are indisputably *important to Chase's defense*, Williams is not suing on Chase's assignment, nor is Williams suing on the 2006 loan modification agreement."); *see also Skipper v. FedEx*, No. 3:23-CV-212-E-BN, 2023 WL 9065085, at *4 (N.D. Tex. Dec. 8, 2023) (collecting cases), *report and recommendation adopted*, No. 3:23-CV-212-E, 2024 WL 41555 (N.D. Tex. Jan. 3, 2024).

Factory Mutual's counterargument is unpersuasive. Factory Mutual emphasizes that the Complaint refers to the Insurance Assignment Agreement and that this agreement states that Factory Mutual "*reinsures* policy number Prop 19-20 issued by International Risk Insurance Company" to

Huntsman. [Dkt. 7-3 at 2 (emphasis added)]. Thus, according to Factory Mutual, the Reinsurance Agreement is both referred to by the Complaint (in paragraph 20) and central to Indorama's claims.

Not so fast. Factory Mutual relies upon questionable "daisy chain" logic for its centrality argument: "if document A [the Insurance Assignment Agreement] is referred to and central to the Complaint, and paragraph 3 in document A references document B [the Reinsurance Agreement], then document B is also central to the Complaint." Such an extrinsic document chess game arguably would make the "referred to and central" exception swallow the rule (Rule 12(d)).

Channeling its broad discretion, the Court sees no reason to consider the Reinsurance Agreement at this juncture. *See Berry v. Texas Woman's Univ.*, 528 F. Supp. 3d 579, 608 (E.D. Tex. 2021) (Schroeder, J.) (citations omitted) (internal quotation marks omitted) ("When a party presents matters outside the pleadings, the Court has complete discretion to either accept or exclude the evidence for purposes of determining the motion."); *see also Chuttoo v. Horton*, 627 F. Supp. 3d 655, 666 (E.D. Tex. 2022) (Jordan, J.) (citing *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988)); *see also Johnson v. Wells Fargo Bank, NA*, 999 F. Supp. 2d 919, 926 (N.D. Tex. 2014) (Lynn, J.) (citation omitted); *see also Morgan v. Medtronic, Inc.*, 172 F. Supp. 3d 959, 964 (S.D. Tex. 2016) (citations omitted); *see also Herrera v. NBS, Inc.*, 759 F. Supp. 2d 858, 863 (W.D. Tex. 2010).

**b. Indorama's Right to Directly Sue**

As explained above, the Court believes that the Reinsurance Agreement is outside the scope of the Complaint. The Court does not *have to* consider it. However, in the interest of efficient case management, the Court will evaluate it, at least in part.[9] *See* FED. R. CIV. P. 1 (stating that the Rules

---

[9] Indorama mentions in passing that the Reinsurance Agreement is unsigned. *See* [Dkt. 11 at 6 ("Defendant's motion is based entirely on the unsigned Reinsurance Agreement attached as Exhibit B to its Motion.")]; *see also* [Dkt. 7-2 at 10]. At this juncture, the authenticity of any extrinsic documents must be undisputed. *See J.G. Alcazar Holdings, LLC v. Prot. One Alarm Monitoring, Inc.*, No. CV SA-16-CA-543-PM, 2016 WL 11773109, at *5 (W.D. Tex. Dec. 15, 2016) (collecting cases).

However, Indorama does not actually question the authenticity of the Reinsurance Agreement. *See generally* [Dkt. 11]. And the Court has no reason to believe that the document does not reflect the agreement between IRIC and Factory Mutual. *See* [Dkt. 7-2 at 2].

"should be construed, administered, and employed by the court . . . to secure the just, speedy, and inexpensive determination of every action and proceeding").

**i. Tex. Ins. Code Ann. § 493.055 & Agreements Based on Course of Dealing**

Factory Mutual contends that Indorama does not have the right to directly sue it—a reinsurer—based on a provision in the Texas Insurance Code. Before looking to that provision, the Court will scythe through the jargon.

"Reinsurance . . . has been described as the transfer of all or part of one insurer's risk to another insurer, which accepts the risk in exchange for a percentage of the original premium." *Tex. Dep't of Ins. v. Am. Nat'l Ins. Co.*, 410 S.W.3d 843, 848 (Tex. 2012). "Reinsurance is not regulated because it typically involves the reallocation of risk between two insurance companies rather than a consumer-insurance transaction." *Id.* at 845. In colloquial terms, reinsurance is "insurance for insurance companies." *Hous. Cas. Co. v. Lexington Ins. Co.*, No. CV H-05-1804, 2007 WL 9751933, at *3 (S.D. Tex. June 25, 2007) (quotation omitted).

Factory Mutual relies on a statute specific to reinsurers. *See* Tex. Ins. Code Ann. § 493.055. The statute is entitled "Limitation on the Rights Against Reinsurer" and provides that

> A person[10] does not have a right against a reinsurer that is not specifically stated in:
> (1) the reinsurance contract; *or*
> (2) a *specific agreement* between the reinsurer and the person.

Tex. Ins. Code Ann. § 493.055 (emphasis added).[11] The relevant "right" in this case is Indorama's right to sue Factory Mutual directly.

---

The thrust of Indorama's argument is that the Reinsurance Agreement is *irrelevant*, not that it is a phony document. For these reasons, Indorama's passing comment presents no barrier. *See Lowe v. Eltan B.V.*, No. 9:05-CV-38, 2006 WL 8457134, at *11 (E.D. Tex. Mar. 27, 2006) (Heartfield, J.) ("This agreement is also unexecuted. However, it certainly appears to this Court that this agreement is the proposed agreement between Antelope and Eltan B.V. for the development of the prototype modular computers."); *see also Berry v. Indianapolis Life Ins. Co.*, 600 F. Supp. 2d 805, 812 (N.D. Tex. 2009) (holding that a policy could be considered since the plaintiffs, "while pointing out that the document [was] unauthenticated, [never] argued that it [was] not in fact authentic" or was incomplete).

[10] The Texas Administrative Code, which contains provisions implementing Chapter 493, defines "person" to include "[a]n individual, corporation, partnership, or other legal entity." *See* 28 Tex. Admin. Code § 7.602(10).

[11] Tex. Ins. Code Ann. Art. 5.75–1(g) is the predecessor to § 493.055. This statute was repealed in 2007.

First stop, § 493.055(1). The Reinsurance Agreement clearly forecloses Indorama's right to directly sue. A section entitled "B. Cooperation of the Company" cabins the rights created by the Reinsurance Agreement: "In no event shall anyone other than [IRIC] or, in the event of [IRIC's] insolvency, its receiver, liquidator, or statutory successor, *have any rights under this Agreement*." [Dkt. 7-2 at 3 (emphasis added)]. A separate section entitled "X. Exclusive Contract" similarly provides that "[i]n no event shall any party, other than [IRIC], or in the event of [IRIC's] insolvency, its liquidator, *have any rights against [Factory Mutual]* under this Reinsurance Agreement." *Id.* at 9 (emphasis added). Indorama never argues that the Reinsurance Agreement gifts them with a right to sue Factory Mutual directly. Since § 493.055(1) is off the table, § 493.055(2) is Indorama's only hope.

There is an implicit debate on what § 493.055(2) means in this case. Factory Mutual argues that there is not a "specific agreement" giving Indorama a right to directly sue it; the Insurance Assignment Agreement is the best candidate, but that agreement only assigns Huntsman's rights under *the Policy* to Indorama. *See* [Dkt. 7 at 8]; *see also* [Dkt. 19 at 9 ("The only contract at issue to which FM is a party is the Reinsurance Agreement[.]")]. On the other hand, Indorama argues that there was a "specific agreement" established through course of conduct. [Dkt. 11 at 8–10]. This exchange raises the following question: does § 493.055(2) only encompass written agreements? Or does it also extend to ones implied by course of conduct?[12] In light of the Texas Supreme Court's silence on this issue, the Court will have to make an *Erie* guess.

The Insurance Code does not provide a nearby definition of "agreement." *See* Tex. Ins. Code Ann. § 493.001 (defining "Assuming insurer" and "Qualified United States financial institution," but not "agreement"). But the analysis does not stall out there. When a statute does not define a key term,

---

[12] There is only one case that substantively engages with § 493.055. *See Health First Health Plans, Inc. v. Am. Nat'l Ins. Co.*, No. 3:20-CV-00226, 2021 WL 4169211 (S.D. Tex. Sept. 13, 2021), *report and recommendation adopted*, No. 3:20-CV-00226, 2021 WL 4458754 (S.D. Tex. Sept. 29, 2021). Although the court did not formally explicate § 493.055(2)'s meaning, it suggested at several points that the statute only encompasses written agreements. *See id.* at *5 (emphasis added) ("In sum, section 493.055 prohibits extra-contractual claims brought against reinsurers unless specifically authorized by a reinsurance contract or a separate *written* agreement.").

To the extent that the *Health First* court was actually explaining the reach of § 493.055(2), the Court respectfully disagrees for the reasons stated below.

courts apply the term's common, ordinary meaning. *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 34–35 (Tex. 2017). Dictionary definitions are helpful in this regard. *Id.*

The dictionary definitions favor Indorama. Black's Law Dictionary indicates that "agreements" can be reduced to a writing, but they do not have to be. *See Agreement*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added) ("2. The parties' actual bargain as found in their language *or by implication from other circumstances, including course of dealing*, usage of trade, and course of performance. UCC § 1-201(b)(3)."); *see also Specific*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "specific" as "[o]f, relating to, or designating a particular or defined thing; explicit[.]").

Other definitions also suggest that an "agreement" can exceed the four corners of a writing. *See Agreement*, MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/agreement (last visited May 19, 2025) (defining "agreement" as "an arrangement as to a course of action"); *see also Agreement*, CAMBRIDGE DICTIONARY ONLINE, https://dictionary.cambridge.org/us/dictionary/english/clearly (last visited May 19, 2025) (defining "agreement" as "a decision or arrangement that has been made and accepted by two or more people, groups, organizations, etc.").

The common law of this State provides another notch on Indorama's scorecard. The Court must construe § 493.055(2) in light of time-worn, common law principles. *See City of Houston v. Rodriguez*, 704 S.W.3d 462, 468 n.22 (Tex. 2024) (citation omitted) (internal quotation marks omitted) ("[W]e construe statutory language against the backdrop of common law, assuming the Legislature is familiar with common-law traditions and principles."). The common law reflects that agreements can sprout from course of dealing and that these agreements are just as valid as written ones. *See, e.g.*, *Ellen v. Carr*, No. A14-88-00307-CV, 1989 WL 102343, at *3 (Tex. App.—Houston [14th Dist.] Sept. 7, 1989, no writ); *see also Ishin Speed Sport, Inc. v. Rutherford*, 933 S.W.2d 343, 348 (Tex. App.—Fort Worth 1996, no writ); *see also Renegade Well Services, LLC v. Amerivax, Inc.*, No. 07-21-00211-CV, 2022 WL 1462274, at *3 (Tex. App.—Amarillo May 9, 2022, no pet.) (collecting cases).

A Texas appellate court decision applying § 493.055(2)'s identical predecessor supports Indorama's position as well. *See Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 564 (5th Cir. 2010) (internal citation omitted) (stating that "lower state court decisions" can be considered when making *Erie* guesses); *see also* Tex. Gov't Code Ann. § 311.023(4) (indicating that courts may consider "former statutory provisions" when construing a statute). The Houston Court of Appeals articulated that—despite the general rule prohibiting direct actions—a reinsurer who "assume[s] certain claim-handling duties"[13] can be liable to an insured based for its conduct during the claim adjustment process. *See Equitas Reinsurance Ltd. v. Browning-Ferris Indus., Inc.*, No. 14-99-01084-CV, 2001 WL 422765, at *4 (Tex. App.—Houston [14th Dist.] Apr. 26, 2001, no pet.). The court emphasized that status as a reinsurer does not create an impenetrable shield: "We do not view the Insurance Code as immunizing a party against any allegations of deceptive claims-settlement practices *simply because the party may also have certain reinsurance duties*." *Id.* (emphasis added).[14]

Finally, there is a cluster of persuasive authorities that the Texas Supreme Court would probably consult which favor Indorama. *See Rentech Steel LLC*, 620 F.3d at 564. For example, the Superior Court of New Jersey has held that a reinsurer's behavior during the claim adjustment process could support a direct action:

> Here, the inexplicable absence of the actual reinsurance agreement from the files of both Mutual and Homestead precludes our examination of the terms of that agreement.

---

[13] The duties the reinsurer assumed resemble Factory Mutual's behavior in the present case:

> Under the terms of the contract, Equitas has the power (1) to *adjust, handle, agree, settle, pay, compromise, or repudiate any claim against the Lloyd's underwriters*; (2) to commence, conduct, pursue, prosecute, settle, appeal, or compromise any legal proceedings by or against the Lloyd's underwriters; (3) *to engage in any discussion or negotiation with any insured person*, reinsured person, class of insured or reinsured persons, reinsurer, broker, legal or other representative of insureds, or any other party in relation to any claim or any other matter; (4) *to enter into, amend, or cancel any claims handling arrangement*; and (5) to instruct lawyers, claim adjusters, or any other experts or consultants in any matter. Equitas is charged to exercise these powers to the fullest extent possible "as if it were the principal." Moreover, Equitas is "not bound to comply with any instructions" from the underwriters.

*Equitas*, 2001 WL 422765, at *4 (emphasis added).

[14] Granted, the reinsurer in this case (Equitas) assumed specific claim-adjustment responsibilities pursuant to a "Reinsurance and Run-Off Contract with the original underwriters[.]" *See Equitas*, 2001 WL 422765, at *4. In layman's terms, there was a writing. In this case, there is not. But, as the Court sees it, this distinction misses the forest for the trees.

> However, *we must consider the role of Homestead, its officers and affiliates, in the entire insuring process* ranging from initial acceptance of this risk and its nominal allocation to Mutual, *to its* assumption of insuring responsibility for 100 percent of the risk and *absolute control of the final claim adjustment*. These key factors demonstrate that the "reinsurance" agreement, whether express *or implied*, oral or written, *was one which would subject Homestead to direct suit* under the authorities cited.

*Venetsanos v. Zucker, Facher & Zucker*, 271 N.J. Super. 459, 472 (N.J. Super. Ct. App. Div. 1994) (emphasis added). Courts from other jurisdictions make the same point.[15]

The Texas Supreme Court would probably hold that insureds can directly sue reinsurers under § 493.055(2) based on an agreement formed by course of dealing (i.e., meaningful involvement in the claim adjustment process).

**ii. Whether Indorama Has Sufficiently Pled an Agreement Based on Course of Dealing**

With this interpretive question handled, the Court must now consider whether Indorama sufficiently alleges an implied agreement through course of dealing. It has.

Indorama alleges that Factory Mutual is far more than a traditional reinsurer. It alleges that Factory Mutual "is responsible for *adjusting insurance claims* and ultimately *paying loss* under the Policy." [Dkt. 1 at ¶ 20 (emphasis added)]. Indorama also alleges that it submitted a claim to Factory

---

[15] *See, e.g.*, *Klockner Stadler Hurter Ltd. v. Ins. Co. of State of Pennsylvania*, 785 F. Supp. 1130, 1134 (S.D.N.Y. 1990) (noting that "the relationship among KSH, Progressive and ICSP does not appear to have been a typical insured/insurer/reinsurer relationship."); *see Allstate Ins. Co. v. Administratia Asigurarilor De Stat*, 948 F. Supp. 285, 307 (S.D.N.Y. 1996) ("Where [ ] an insured consistently deals directly with its insurer's reinsurer, however, the reinsurer may become directly liable to the insured."); *see Jurupa Valley Spectrum, LLC v. Nat'l Indem. Co.*, No. 06 CIV. 4023 (DLC), 2007 WL 1862162, at *8 n.9 (S.D.N.Y. June 29, 2007), *aff'd*, 555 F.3d 87 (2d Cir. 2009); *see Exec. Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.*, 681 F. Supp. 2d 694, 724–25 (S.D.W. Va. 2009); *see Felman Prod., Inc. v. Indus. Risk Insurers*, No. CIV.A. 3:09-0481, 2009 WL 3380345, at *2 (S.D.W. Va. Oct. 19, 2009) (citations omitted); *see Ario v. Swiss Reinsurance Am. Corp.*, 940 A.2d 552, 558 (Pa. Commw. Ct. 2007) (citation omitted); *see O'Hare v. Pursell*, 329 S.W.2d 614, 621 (Mo. 1959) (holding that insureds could bring a direct action against a reinsurer when it "took over and serviced" the policy, paid claims against the insureds arising under it, and accepted premium payments); *see Edens v. United Ben. Life Ins. Co.*, No. 4:01-CV-0263-A, 2001 WL 1143140, at *10 (N.D. Tex. Sept. 25, 2001) (acknowledging the general privity rules but declining to hold that an insured could not assert a direct action since an agreement hinted that the reinsured was "simply fronting" for the reinsurer); *see Sw. Sur. Ins. Co. v. Stein Double Cushion Tire Co.*, 180 S.W. 1165, 1168 (Tex. App.—Dallas 1915, writ ref'd) (emphasis added) (explaining the "*general rule* that the liability of the reinsurer is solely to the reinsured, and the party originally insured has no right of action against the reinsurer[.]"); *see Midtown Hotel Grp. LLC v. Selective Ins. Co. of Am.*, No. CV-22-01395-PHX-JAT, 2023 WL 3603677, at *5 (D. Ariz. May 23, 2023) (applying Colorado and California law and critiquing a reinsurer's ability to "use its claims control rights . . . as a sword against policyholders to minimize payments while simultaneously using its contractual distance as a shield against liability for any bad faith it might perpetrate"); *but see Three Rivers Hydroponics, LLC v. Florists' Mut. Ins. Co.*, No. 22-1140, 2023 WL 5554644, at *3 (3d Cir. Aug. 29, 2023) (explaining that a reinsurer's mere oversight over the claim adjustment process does not expose it to direct actions).

Mutual under the Policy and that Factory Mutual actually paid the $50 million limit for CTEE Coverage. *Id.* at ¶¶ 22, 61, 63.

The Adjustment Emails tighten these allegations. On May 29, 2020, Kyle Vachon, a Senior Adjuster for Factory Mutual, sent Indorama and Huntsman an email which (i) directly referenced the Policy, and (ii) explained that the CTEE Coverage was the applicable provision for the loss:

> *FM Global Policy No. 1057320, which was issued to [Huntsman] and has an inception date of November 1, 2019*[16], has coverage for Contingent Time Element Extended losses . . . As FM Global *has been evaluating this loss event* and its impact on [Huntsman and Indorama], we are considering these other coverages as part of our measurement of the [CTEE] loss directly stemming from the physical damages at TPC Group's Port Neches site.

[Dkt. 11-1 at 3, 5 (emphasis added)]. Factory Mutual asked for "specific details" to further assess Indorama's argument that the loss triggered the Policy's Service Interruption Coverage. *Id.* at 5.

Factory Mutual's email on December 9, 2020 is more of the same. The first paragraph of this email provides a birds-eye view of the "extensive correspondence" between Indorama and Factory Mutual, further showing the latter's thigh-deep immersion in the claim adjustment process:

> This responds to your letter of October 9, 2020. As your letter notes, Indorama/Huntsman's arguments for coverage under the Policy's Service Interruption provision *have been the subject of extensive correspondence between the parties*, including FM Global's letters of May 29, 2020 and September 16, 2020, and Indorama's letters dated July 20, 2020 and October 9, 2020.

*Id.* at 6 (emphasis added). The email referenced the Policy as "the Factory Mutual Insurance Company Policy" and requested Indorama to "provide the information requested" if it intended to continue "pursu[ing] these matters." *Id.* at 9.

And the Insurance Assignment Agreement is icing on top of the cake. It provides that "[Huntsman] hereby authorizes [Indorama] to take any appropriate action to protect the right, title and interest hereby conveyed in this Insurance Assignment Agreement, *including the right to adjust the Claim directly with FM Global*[.]"[17] [Dkt. 7-3 at 3 (emphasis added)].

---

[16] *See* [Dkt. 7-1 at 5].

[17] Additionally, the Policy itself states that "[Factory Mutual] will adjust all claims made under this Policy" and names Factory Mutual as a "representative company" in the definitions section. *See* [Dkt. 7-1 at 6, 80].

Altogether, Indorama's allegations, the Adjustment Emails, and the Insurance Assignment Agreement sufficiently establish Indorama's right to directly sue Factory Mutual, at least at this stage.[18] *See Osterhout v. Morgan*, No. CIV-17-99-RAW, 2023 WL 6163985, at *2 (E.D. Okla. Sept. 21, 2023) (denying a motion to dismiss since "there [were] indications CLR may be functioning as a primary insurer").

Indorama has sufficiently pled a right to sue Factory Mutual directly based on an implied agreement *outside* the Reinsurance Agreement. *See* Tex. Ins. Code Ann. § 493.055(2). Indorama, a nonparty to the Reinsurance Agreement, can nevertheless be "subject to a [its] terms by knowingly seeking and obtaining direct benefits from [it], by seeking to enforce [its] terms . . . or by asserting claims that must be determined by reference to [it]."[19] *See Motis Energy, L.L.C. v. SWN Prod. Co., L.L.C.*, 802 F. App'x 848, 850 (5th Cir. 2020) (per curiam) (internal quotation marks and citation omitted). But here, Indorama is not seeking benefits under the Reinsurance Agreement, does not seek to enforce its terms, and is not asserting a claim that must be determined by reference to it: Indorama's claim operates on a different plane entirely. For this reason, the forum selection clause falls to the wayside. *See id.*; *see also Nat'l Builders Ins. Co. v. Architects, Devs. & Contractors, Inc.*, No. 5:20-CV-162-H, 2020 WL 10458629, at *3 (N.D. Tex. Dec. 17, 2020) ("Because NBIC does not sue under or seek the benefits of the construction contract, it cannot be bound as a nonsignatory to the arbitration

[18] Candidly, there might be some fact issues.

In an email regarding the Insurance Assignment Agreement, Factory Mutual (1) refers to the Policy as "the Policy issued by IRIC," (2) refers to itself as a reinsurer (and IRIC as the reinsured), (3) agreed that "IRIC will continue any available coverage for the Claim on [Indorama's] behalf under the Policy," and (4) mentioned that there was no need to include it as a party to the Insurance Assignment Agreement since it was merely a reinsurer. *See* [Dkt. 7-3 at 8]. Additionally, the Policy does list IRIC as the owner of the Policy. *See* [Dkt. 7-1 at 81].

However, since the Court must read all attachments in the light most favorable to Indorama, these fine details do not justify dismissal given the preceding discussion. *See Wood*, 2023 WL 3563012, at *1.

[19] The doctrine of direct benefits estoppel is designed to "prevent[] a non-signatory from 'hav[ing] it both ways,' whereby the non-signatory attempts to benefit from one part of the contract but avoid the forum selection clause contained therein." *Stellar Restoration Servs., LLC v. James Christopher Courtney*, 533 F. Supp. 3d 394, 423 (E.D. Tex. 2021) (Jordan, J.) (citing *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 361 (5th Cir. 2003). But, in this case, direct benefits estoppel sounds in irony: Indorama has sufficiently alleged that *Factory Mutual* is the one trying to have it both ways (i.e., by acting as a direct insurer during the claim adjustment process, but retreating behind reinsurer status for purposes of litigation).

provision in the contract under direct-benefits estoppel."); *see also Black v. Diamond Offshore Drilling, Inc.*, 551 S.W.3d 346, 355 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (holding similarly in the context of a forum selection clause).

## IV. CONCLUSION

For the reasons stated above, it is **ORDERED** that Defendant Factory Mutual Insurance Company's Rule 12(B)(6) Motion to Dismiss [Dkt. 7] is hereby **DENIED**.

**SIGNED this 7th day of August, 2025.**

Michael J. Truncale
United States District Judge